It is not the province of the court to make contracts; it may only enforce those which have been made, where they are within the law.

The judgment and order appealed from should be affirmed, with costs.

JENKS, P. J., and CARR and RICH, JJ., concur. THOMAS, J., dissents.

(77 Misc. Rep. 581.)

NEW YORK MOTION PICTURE CO. v. UNIVERSAL FILM MFG. CO. et al.

(Supreme Court, Special Term, New York County. September 24, 1912.)

1. INJUNCTION (§ 137*)—TEMPORARY INJUNCTION—RIGHT TO TEMPORARY INJUNCTION.

Where it is doubtful whether plaintiff, suing for the cancellation of contracts, will succeed, and interference by the court by temporary injunction may result in irreparable injury to defendant, if he finally succeeds in the suit, the court will not, at plaintiff's motion, grant a temporary injunction.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 307, 309; Dec. Dig. § 137.*]

2. INJUNCTION (§ 136*)—TEMPORARY INJUNCTION—GROUNDS.

Where, in a suit to cancel a contract whereby plaintiff, a corporation, engaged in the production and distribution of materials for the moving picture business, transferred its business to defendant, it appeared, on plaintiff's motion for a temporary injunction, that the contract reduced to writing was complete as between plaintiff and defendant, and that plaintiff relied on an oral agreement that the contract should not become effective, unless others engaged in the same business conveyed their business to defendant, a temporary injunction would not be granted on the ground of lack or failure of consideration.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 305, 306; Dec. Dig. § 136.*]

3. INJUNCTION (§ 136*)—TEMPORARY INJUNCTION—GROUNDS.

The court, in a suit by a corporation to cancel a contract whereby it transferred its business of producing and distributing materials for the moving picture business to defendant, and whereby its stockholders agreed not to engage in such business for five years in any part of the United States or Canada, except Arizona, will not grant a preliminary injunction on the theory of the illegality of the transaction as an illegal restraint of trade.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 305, 306; Dec. Dig. § 136.*]

4. CORPORATIONS (§ 14*)—LEGALITY.

A corporation is not illegal, unless it is shown that the end it has in view is illegal, or the means whereby it proposes to attain that end is illegal; but the fact that a corporation may be used for illegal purposes, or could be so used, is not necessarily any proof of its illegality.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 16–22; Dec. Dig. § 14.*]

5. MONOPOLIES (§ 12*)—PROHIBITED COMBINATIONS.

A combination designed to promote the interest of a particular trade, diminish waste, give better service, extend the business, and secure better prices is not necessarily violative of the law; and an averment that negotiations between corporations engaged in the same business, resulting

in a contract transferring the business to one corporation, is a conspiracy, does not justify an inference of unlawful purpose or act.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*]

6. INJUNCTION (§ 136*)—TEMPORARY INJUNCTION—GROUNDS.

The court, in a suit by a corporation to cancel its contract, whereby it transferred its business of producing and distributing materials for the moving picture business to defendant, on the ground that the contract is invalid as in restraint of trade, will not grant a temporary injunction, on the motion of plaintiff, since the combination resulting from the transaction must be shown to be illegal as a matter of fact.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 305, 306; Dec. Dig. § 136.*]

Action by the New York Motion Picture Company against the Universal Film Manufacturing Company and others. On motion by plaintiff for a temporary injunction. Denied.

Graham and Stevenson, of New York City, for plaintiff.

Waldo G. Morse, of New York City, for defendants.

DELANY, J. This action is brought for the purpose of compelling the defendant the Universal Film Manufacturing Company to deliver up certain contracts and other papers, and of securing a judgment rescinding them, and in general to restore the plaintiff to the position in which it would have been, had not the several transactions purported to have been done between plaintiff and defendant never occurred. This motion is made with the intention of inducing this court to restrain and prohibit certain acts on the part of the defendant, during the pendency of the action, which would interfere with or impede the freedom of action of the plaintiff in its business and rights as they were before the execution of the several contracts referred to, the annulment of which is asked for in its complaint.

[1] If it appears from the papers that the plaintiff has presented a case which seems to justify the expectation that on the trial the plaintiff would then be entitled to the judgment sought, it would appear to be proper that the court on this motion may intervene to prevent the injury to plaintiff which, if not prevented now, would become irreparable before final judgment could be secured.. If, however, the interference of this court, as asked by plaintiff now, should, in the event of the defendant finally succeeding, be likely to work irreparable injury to the defendant, the question of the likelihood of the plaintiff ultimately securing a judgment becomes of prime importance. This can, of course, only be determined by the sufficiency of the papers submitted, and if the plaintiff's ultimate success appears to be doubtful, the court is constrained to deny such a motion, for the reason that it cannot in justice exercise its power in a doubtful case to prevent irreparable injury to one at the expense of permitting irreparable injury to the other.

[2] It appears that the parties hereto were, prior to entering into the several alleged agreements alluded to, engaged in branches of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

business connected with the production and distribution of materials required for what is called the "moving picture business," and that they, or some of them, met in negotiation intended to bring about some sort of combination of their several businesses to improve their trade, prevent waste, and generally solidify their enterprise, which, it is claimed, was needed for their profit and standing. Their negotiations seemingly reached a conclusion where it was determined advisable to sell their several businesses to the defendant the Universal Film Manufacturing Company, and each party severally entered into a contract with the defendant. The contract with the plaintiff sets forth the existence of the defendant and character of its charter rights; its intention to increase its capital for the increase of its business, and that the plaintiff is "willing to sell its said entire business, assets, good will, subject to the provisions hereinafter stated, and the parties have stated and have agreed upon a purchase price for such sale and purchase, consisting of $250,000 first mortgage bonds and $204,000 in full-paid and nonassessable capital stock of the said party of the second part," and the property agreed to be sold is set forth as the entire business as a going concern, detailing in great number and particularity the assets, physical properties, and rights of plaintiff, and a day is fixed for the sale and delivery. This contract provides that, simultaneously with the completion of the sale and transfer, the plaintiff shall secure and deliver an agreement of all the stockholders severally that they will not engage in or become interested in the business of manufacturing moving picture films for five years in any place in the United States or Canada, except in Arizona, unless on the consent of the defendant. All the stockholders of plaintiff's company executed a paper ratifying and confirming this agreement in all its details. The day fixed for its execution was May 23, 1912; but on that day another agreement was executed, which recited that it was "found impossible by both parties to accomplish such transfer and to have the same completed within the time of said contract limited, and the parties having accordingly extended the time for the completion of such transfer, such extension to be on the conditions herein." Among other provisions are an extension of time to complete to June 10th; that from May 20th, the date of this supplemental agreement, "the business of the said New York Picture Company shall be conducted for the account and benefit of said Universal Film Manufacturing Company," and "simultaneously with execution hereof" plaintiff will call its stockholders to deposit all their certificates of stock with Jules E. Brulatour as collateral security both for the performance by said New York Motion Picture Company of its contract of May 3d and to hold in trust, and "on completion he shall deliver same to depository named in the contract." Thereafter another paper is executed "by all the stockholders," agreeing not to engage in business as provided in agreement of May 3d, and to assume personal liability for any claim against plaintiff's company, and to repay any sum which defendant might have to pay on account of such claims, and to indemnify the defendant, etc. Then the bill of sale appears,

disposing to defendant of the entire business of plaintiff as a going concern; the stated consideration being 204,000 shares of capital stock and "$250,000 in registered first mortgage gold bonds (or temporary certificates representing such bonds)."

In the transfer of the business of the plaintiff or the organization of the defendant, or in its transactions up to this point, I do not observe any irregularity or defect, and it appears that the transaction, so far as the usual formalities are concerned, is without flaw. During the negotiations leading up to this situation, one of the principal parties acting for the plaintiff was Charles O. Bauman. He was the secretary of the plaintiff, and when the associated interests took over the control of the defendant he became its president. On June 10th he presided at the meeting of the board of directors of the defendant company, whereat was reported the completion of the delivery to the plaintiff of the considerations and the fulfillment of the agreement. After that meeting for quite some time Mr. Bauman participated in the affairs of the defendant, voting on the fixing of salaries and other administrative questions, and signed checks for the business, which unmistakably included all that there was of the New York Motion Picture Company's right and properties. This same Bauman now is the principal affiant on behalf of plaintiff on this motion. The most striking feature of the moving papers and exhibits is that not a question, as it seems to me, can be raised as to the sufficiency or the regularity of these transactions, so far as set forth in the documentary exhibits, and they of themselves are ample to tell the entire story of the course pursued by the parties. The only transactions which might be considered as vitiating the contract depend on statements of Bauman, without the support of any writing incidental to the matter.

It must be observed, although it is not necessary to enter into a discussion of it now, that there are several defendants who, it is claimed, were similarly with the plaintiff interested in the undertaking, and who had invested their entire businesses in it, and I do not see that any action on the part of the plaintiff has been taken to do the equities which might be necessary to minimize their damage if the plaintiff is entitled to change its position in this transaction. As I follow the history of the enterprise, the first desire of plaintiff to change its position was not manifested until after Brulatour withdrew from the defendant company. It would appear that the position of Brulatour was exceptional. The several other persons who seemingly joined their interests in the defendant company were the absolute owners of businesses connected with the motion picture trade, but not so Brulatour. He was an important factor in the trade, and the purchase of his interest and services was considered a good stroke of business. But after the defendant had bought what it was supposed was his interest, it was found that he had nothing that he could absolutely transfer. He had a contract with the Eastman Kodak Company giving him a sales agency of certain goods. But the Kodak Company had reserved a right to terminate it under certain conditions, and had given notice that, if this interest was kept in the defendant company, it would be unwilling to waive

that provision, but would end the contract. When this situation was presented to the directors, it appeared to be wise to transfer Brulatour's contract to him and take back the consideration paid him. Mr. Bauman presided at that meeting, and the vote to adopt this course was unanimous. At a meeting thereafter he executed a reconveyance to Brulatour, although he then opposed a confirmation of the motion of the previous meeting on the subject, and voted against the resignation of Brulatour from the board and his withdrawal from the company. The course of the board, under the circumstances, was prudent, and, so far as the relations of the parties appear from the contracts, unjust to no one. Thereafter Bauman resigned from the board of directors, and with the other former stockholders of the plaintiff seemed to assume the right to treat all the foregoing agreements, etc., as a nullity, and to deny the right of defendant to assert any title to or exercise any control over the property formerly belonging to the plaintiff. A train of occurrences followed, not necessary to discuss now.

The validity of the transactions is now attacked because of the alleged conduct of the counsel who organized the corporation. Plaintiff charges that it was the victim of the deception by the counsel, claiming that he delivered the bill of sale and other papers in violation of an agreement to hold them in escrow for the delivery of the consideration. It does not seem natural that such a plan should have been adopted, and I see no necessity for such a course. The fact is weakened by this very improbability, and, while I can now determine nothing on that subject, its consideration must not be wholly omitted. While every necessary paper in the course of this business was prepared, and nothing seemingly left to oral agreement, it is strange that this situation should arise without a scratch of a pen to show it. Besides, the minutes of the board (with Bauman present) seem to negative it. It is also urged that the transactions were by oral agreement to be taken as one, and that all the interested parties were to combine, and, if they did not, the whole scheme should fail. There is no indication of such an understanding in the papers. The plaintiff dealt severally and separately with the defendant, and the contract inter sese was complete, whatever may have been the expectation of the parties previously expressed. I am not now to determine the facts; but, viewed from the standpoint of a trial, would such evidence be admissible to controvert a subsequent written agreement, clear in its terms and entered into with such formality and deliberation? There are some other observations and many other points made which for the sake of brevity I omit dilating on here.

[3] Passing, then, the questions of lack of consideration or failure of consideration, we meet the really substantial contention; that is, that the entire transaction is illegal and void, being an illegal restraint of trade, and so antagonistic to public policy. The fact that the supplemental contract provides that the plaintiff and all stockholders and others interested in plaintiff company are prohibited from engaging in their special business for a period of five years in any

part of the United States or Canada, except Arizona, may come up for construction if any action is brought on it; but, in view of the state of the law (see Diamond Match Co. v. Roeber, 106 N. Y. 473, 13 N. E. 419, 60 Am. Rep. 464; Nat. Wall Paper Co. v. Hobbs, 90 Hun, 288, 35 N. Y. Supp. 752), there is no need of discussion on this point. It is contended that the contracts are void, because their tendency is to monopolize and restrain trade. The papers of the moving party, referring to the defendant and these transactions, frequently use the terms "combination," "scheme," "conspiracy," "fraudulent arrangement," and the like; but I have searched for specific allegations which would justify the sinister meaning evidently intended to be given to them without avail.

[4] A corporation cannot be said to be illegal, unless it is shown that the end it obviously has in view is illegal or the means whereby it proposes to attain that end is illegal. This is merely the general test prescribed by a sound morality. If either of these conditions is manifest, the corporation is illegal; but the fact that such a corporation may be used for illegal purposes, or could be used for such, is not necessarily any proof of its illegality. Such a contention is based on the old argument drawn from the abuse of a thing.

[5] Merely characterizing the persons associating together a combination alleges no wrong, because a combination of interests is not necessarily unlawful. To say that their negotiations, either before or after formation into one body, is a conspiracy, is not sufficient to establish even an inference of unlawful purpose or of unlawful act. Nor is the mere possibility of an abuse of power sufficient ground to claim that the existence of the body threatens the public with a monopoly or an unlawful restraint of trade. Not every restraint of trade is illegal. A combination designed to promote the interest of a certain trade, to diminish waste, to give better service, to extend business, and to secure better prices is not necessarily violative of the law either in the end in view or the means of attaining it. That it might be or become so is another question, to be shown by other facts; and no such facts, in my opinion, are clearly shown in the moving papers herein.

[6] There is, however, another important phase in this case. The iniquity of this combination does not appear to have been raised until after the plaintiff deemed it advisable to withdraw and to render everything done, as far as it could do so, nugatory. But if we take the statement of Bauman, who acted for the plaintiff, this was not the first time that such a suggestion came to him. He says that in their initial conference, preceding the making of several written contracts, the attorney "stated in my hearing that it would be unsafe to put the said contract in writing, as it might later be used as proof of an illegal trade combination; but that we had better put portions only in writing, and trust one another to keep the unwritten part of the contract." This statement he immediately supplements with the avowal that "since this attorney was acting for me in a legal capacity, as much as for any of the others, I did not consult any other attorney at any time, but placed my implicit faith in

him." Whether it was contentment or supineness which prevented any action on the part of the affiant at that time does not appear; but if his now quickened conscience had stirred him at all, he would have abandoned his implicit faith in counsel there and then, and the plaintiff might have been spared the necessity of this litigation altogether. I am not determining this case now; but as an element in the consideration of this motion it may be well to keep in mind the requirement that he who comes into a court of equity must come with clean hands. The attorney in question denies having ever made such a statement, but whether he did or not is immaterial now. The combination, as stated above, would have to be shown to be illegal, and the dread of an attorney that the corporation was or might later be determined to be illegal would have no weight. If it was not illegal, the one thinking otherwise, and wishing notwithstanding to pursue its purposes, would be in a bad state of conscience; but the existing conditions would be unaffected by that. Bornmann v. Star Co., 174 N. Y. 212, 66 N. E. 723; Park & Sons Co. v. Nat. Druggists Ass'n, 175 N. Y. 20, 67 N. E. 136, 62 L. R. A. 623, 96 Am. St. Rep. 578.

There appears to be no further need to discuss this motion. It is plain to me that, apart from other considerations, plaintiff has not shown in its moving papers such a clear right to the relief sought pendente lite as would warrant this court to intervene in behalf with injunctions, which would in all likelihood do irreparable injury to the defendant.

Motion denied, with $10 costs.